**THE UNITED STATES DISTRICT COURT**
**FOR THE UNITED STATES VIRGIN ISLANDS**
**BANKRUPTCY DIVISION**

| | |
|---|---|
| In re: | ) |
| | ) Bankruptcy No. 06-30009 |
| JEFFREY J. PROSSER, | ) Chapter 7 |
| | ) |
| Debtor. | ) |
| | ) |
| ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾ | ) |
| OAKLAND BENTA, JEFFREY J. | ) |
| PROSSER, AND DAWN E. PROSSER, | ) |
| | ) Adv. Pro. No. 3:21-ap-03001-MFW |
| Plaintiffs, | ) |
| v. | ) |
| | ) |
| CHRISTIE'S INC., CHARLES ANTIN, | ) |
| FOX ROTHSCHILD LLP, YANN | ) |
| GERON, WILLIAM H. STASSEN, | ) |
| DAVID M. NISSMAN, JAMES P. | ) |
| CARROLL | ) |
| | ) |
| Defendants. | ) |
| ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾ | ) |

**MEMORANDUM OF LAW**
**IN OPPOSITION TO DEFENDANTS'**
**MOTION TO DISMISS THE COMPLAINT**

**Preliminary Statement**

This Memorandum of Law ("MOL" or "Memorandum") is respectfully submitted in opposition to the defendants' joint Motion to Dismiss (Dkt # 23). Terms used in this document, unless otherwise defined herein, are defined by the Complaint. This case, *Prosser et al v. Carroll et al,* 3:21-ap-03001-MFW, is related to and is an outgrowth of the Turnover Proceeding, Adv. Pro. No. 07-ap-03010 ("TO Adv."). The Complaint that initiated this adversary proceeding is an outgrowth of actions, both discretionary and intentional, taken by the Court-Appointed Chapter 7

Professionals, also referred to as the "Defendants.[1]"

The designation by Plaintiffs of the "**Shoys Wines Fraud**" has three specific subparts:

a.  The sham July 29, 2011 effort to collect the Shoys Wines (Complaint – Defined Term) that is hereinafter referred to as the **Sham Wine Collection;**[2]

b.  The knowing and intentional violations of 18 U.S.C. §§ 152 and 157 committed by the filing of the August 4, 2011 Motion for Contempt [TO Adv. # 756] (Complaint – Defined Term) that is hereinafter also referred to as the **False Accounting**; and

c.  The ensuing coverup related to the *Sham Wine Collection* and the *False Account* that included the obstruction of the Virgin Islands Police Department's ("VIPD") Shoys Wines Criminal Investigation (Complaint – Defined Term) and the attempt to deny Plaintiffs' evidence that is hereinafter collectively referred to as the ***Shoys Wines Coverup***.

**Overview of Plaintiffs' Claims**

The Complaint seeks civil recovery for the damages that Plaintiffs experienced and are still experiencing because of the *Sham Wine Collection,* the *False Account,* and the *Shoys Wines Coverup.* For purposes of this Memorandum, Plaintiffs refer to the Court-Appointed 7 Professionals interchangeably as the Court-Appointed 7 Professionals and/or simply as the "*Defendants*."

While each act was not performed by each defendant, the Defendants were acting

---

[1] Defendant David Nissman was Court-Appointed on Dec. 15, 2011. Adv. Pro. 07-03010, Entry 887. Prior to his appointment, Mr. Nissman represented Defendant Christie's and was Christie's agent. Def. Christie's was Court-Appointed; thus, Mr. Nissman actions are within the scope of Court-Appointed 7 Professionals. Mr. Nissman was principally involved the *Shoys Wine Coverup*.

[2] The phrase '*Sham Wine Collection'* includes the acts after the Turnover Over in preparation for the Sham July 29, 2011 excursion to St. Croix.

collectively and thus, are liable for civil damages. For example, Def. Christie's agent, Def. Antin, admitted under oath to committing perjury in a declaration filed in support of the *False Account* made to the Court, an admitted violation of 18 U.S.C. § 152(3).[3] Def. Carroll ("Trustee"), as the Chapter 7 Trustee, had the duty under 18 U.S.C. § 3057(a)[4] to refer Mr. Antin to the U.S. Attorney for the Virgin Islands. It was incumbent upon the Estate's Counsel to advise Def. Carroll of his duty to make the referral. However, the evidence indicates that the only person referred by Def. Carroll was the Prossers. *Complaint ¶ 66(ll), (mm), (nn)*. Defendant Nissman's involvement in the Shoys Wine Coverup was assist in avoiding accountability for the perjurious declaration. All the parties were acting in concert.

Plaintiffs are aware that Judge Fitzgerald excused Mr. Antin's perjury [*Complaint ¶ 123*]. However, 18 U.S.C. § 3057(a) is mandatory; it serves the public policy of protecting the integrity of the bankruptcy system rather than a specific victim.[5] Judge Fitzgerald's actions regarding the Antin perjury does not excuse the Chapter 7 Trustee of his obligations under the law. It is a serious abuse of the bankruptcy system when a perjurious declaration by a Court-Appointed 7 Professional is submitted in any court filing, let alone one submitted as the primary support for a motion for

---

[3] 18 U.S.C. § 152 - "A person who—(3) knowingly and fraudulently makes a false declaration … under penalty of perjury as permitted under section 1746 of title 28, in or in relation to any case under title 11 … shall be fined under this title, imprisoned not more than 5 years, or both."

[4] 18 U.S.C. § 3057(a) – "Any judge, receiver, or trustee having reasonable grounds for believing that any violation under chapter 9 of this title or other laws of the United States relating to insolvent debtors, receiverships or reorganization plans has been committed … shall report to the appropriate United States attorney all the facts and circumstances of the case …"

[5] *Stegeman v. United States*, 425 F.2d 984, 986 (9th Cir. 1970) (*en banc*) (("[Section 152] was enacted to serve important interests of government, not merely to protect individuals who might be harmed by the prohibited conduct."); U.S. Trustee Program (The United States Trustee Program is a component of the Department of Justice whose mission is to promote the integrity and efficiency of the bankruptcy system for the benefit of all stakeholders–debtors, creditors, and the public.), https://www.justice.gov/ust.

contempt.[6]

Judge Fitzgerald actions subsumed the United States Attorney's authority by not referring the known submission of a False Declaration to officials at the Department of Justice. Frankly, everyone associated with the False Contempt Motion should have been referred. This statutory duty is imposed upon the Judge and the Trustee. It was the Debtor, Jeffrey Prosser, who is the beneficiary meant to be protected by that duty.

The response to Defendant's Motion to Dismiss the Complaint implicates many legal issues, including, but not limited to:

    a.  The Trustee's Fiduciary Duties, as allegedly applied to the facts of the case;

    b.  The record of proceedings by which the Court's instructions narrowed the Prossers' defenses to the Trustee's Contempt Motion;

    c.  Matters related to this Court's Jurisdiction; and

    d.  This Court's and Trustee Carroll's duty to refer under 18 U.S.C. § 3057(a).

### The Statutory Duty to Refer

The Complaint sets forth ample allegations demonstrating a conspiracy under the color of law or color of official right that is still, as of this day, is operative against the Prossers' exempt assets [*Complaint ¶ 136:144*]. Further PL JProsser has been denied a 'fresh start.'

The Complaint sets out a credible claim that the judgment against the Prossers' exempt property is retaliatory, extortionary, and was done under the color of official right (*i.e,* color of law). Therefore, the statutory duty under 18 U.S.C. § 3057(a) to refer Antin for his false declaration and his attempt to destroy the Shoys Wines is still within criminal limitations statute. By this

---

[6]  See *1-7 Collier on Bankruptcy P 7.01 (16th 2016)* (bankruptcy crimes are not concerned with individual loss or even whether certain acts caused anyone particularized harm. Instead, the statutes establishing the federal bankruptcy crimes seek **to prevent and redress abuses of the bankruptcy system**).

proceeding, it is placed before this Court. Given the policy considerations in the adoption of 18 U.S.C. § 3057(a), the statutory duty imposed thereby must be interpreted broadly and Judge Fitzgerald's failure to abide by the statute excuses neither the Chapter 7 Trustee nor this Court.

In preparing this response another matter has come to the Plaintiffs' attention which, should be further investigated in the context of 18 U.S.C. § 3057(a) and a referral to the United States Attorney warranted:  a conspiracy to embezzle Cognac from the Shoys Wines.

In an internal Christie's e-mail dated July 6, 2011, Christies admitted that  " . . .  They (presumably referring to themselves or the Chapter 7 professionals) are keeping the [Erte], which brings it [expected proceeds] down to $82-114k." 'Erte' refers to bottles, usually very expensive wines or cognac, designed by Russian deco-artist Erté. Plaintiffs believe the email referenced bottles of Louis XIII Cognac of which there was more than one bottle and less than ten bottles within the collection of Shoys Wines. Theft by a fiduciary of a single bottle[7] of Louis XIII Cognac embezzled by a Fiduciary under Virgin Islands law [14 V.I.C. § 1091] could result in a prison term of up to ten years [14 V.I.C. § 1094]. 11 U.S.C. § 153 punishes embezzlement with up to 5 years of imprisonment. Plaintiffs cannot know with specificity who was referenced by the term " "they" but, one thing is for certain:  it was neither the Prossers nor the Estate's unsecured creditors. At a minimum, a hearing to determine the facts of this issue is warranted.

Specifically, an evidentiary hearing should be held to deduced whether one of more persons should be referred under 18 U.S.C. § 3057 or removed for cause. An Evidentiary Hearing would weigh heavily upon the Barton Doctrine issues. This issue is highly probative and would have a heavy bearing upon objectively establishing the Defendants' intent.

**Prior Litigation Background – the District Court Dismissal**

---

[7]  See https://theswisspub.com/louis-xiii-cognac/

The Complaint in this case was originally filed in the Virgin Islands District Court ("District Court" or "VIDC") captioned as *Benta et al. v. Christie's, Inc. et al.*, Civil No. 2013-0080 (D.V.I.). The District Court, in its Memorandum Opinion ("mem. Op.") dismissing the Complaint on *Barton* grounds, made the following findings of law. Those finding resonate here.

> Plaintiffs' argument is based upon a fundamental misconstruction of the *Barton* doctrine. The *Barton* doctrine does not require Plaintiffs to pursue their claims against these Defendants in the Bankruptcy Court, nor does it require the Bankruptcy Court to have jurisdiction over the merits of the claims. Rather, *Barton* simply protects the Bankruptcy Court's proceedings by ensuring that the Bankruptcy Court is apprised of the allegations and determines that Plaintiffs' claims against Defendants are **not without foundation**. *In re VistaCare Group, LLC*, 678 F.3d at 232.

*Mem. Op.* at page 20 (Emphasis added).

> Accordingly, the issue is *not* whether the Bankruptcy Court would have subject matter jurisdiction to determine the merits of Plaintiffs' amended claims, **but whether Plaintiffs met the condition precedent for this Court's subject matter jurisdiction**, *i.e.*, obtaining the Bankruptcy Court's approval to pursue the claims against the Trustee and his agents

*Mem. Op.* at page 20 (Emphasis added).

> Accordingly, despite Plaintiffs' arguments to the contrary, the *Barton* doctrine undisputedly applies in this case. Plaintiffs' failure to complain therewith leaves **this Court without subject matter jurisdiction over this matter**.

*Mem. Op.* at page 22 (Emphasis added).

The District Court found the Barton doctrine to be a *condition precedent for* its *subject matter jurisdiction*. It further found that the doctrine applied to this case leaving the Court without subject matter jurisdiction to consider the Complaint's allegations. The Barton Doctrine presented a procedural bar to the District Court's consideration of the Complaint's allegations concerning any other issue other than the Barton Doctrine.

Regarding the factual allegations in the Complaint, the District Court's holding is encapsulated in the following language:

> In other words, regardless of the motives ascribed to, or claimed illegality of, the conduct

of the court-appointed officials, **as long as their conduct is attributable to their functions in the bankruptcy process** and are done under the Bankruptcy Court's supervision, **the *Barton* doctrine applies**.

*Mem. Op.* at page 18 (Emphasis added).

The Complaint's allegations were based upon the Defendants' *functions in the Bankruptcy process*; therefore, *the Barton doctrine applies*.

The District Court considered the Complaint's allegations only in a relationship to the Defendants' functions in the Bankruptcy process. Once that nexus was evident, the District Court concluded that no subject matter jurisdiction existed and thus, it could not consider any substantive issues. The District Court's dismissal was *without prejudice*.

Thereafter, at the suggestion of the District Court, Plaintiffs filed this suit in this Court to obtain this Court's permission to pursue the causes of action in the District Court. In particular, the District Court's memorandum is instructive:

> Plaintiffs' argument is based upon a fundamental misconstruction of the *Barton* doctrine. The *Barton* doctrine does not require Plaintiffs to pursue their claims against these Defendants in the Bankruptcy Court, **nor does it require the Bankruptcy Court to have jurisdiction over the merits of the claims**. Rather, *Barton* simply protects the Bankruptcy Court's proceedings by ensuring that the Bankruptcy Court is apprised of the allegations and determines that Plaintiffs' claims against Defendants **are not without foundation**. *In re VistaCare Group, LLC*, 678 F.3d at 232. If the Bankruptcy Court makes this finding, Plaintiffs may pursue these claims in state or federal courts that may otherwise hear them. **Whether the Bankruptcy Court would have jurisdiction to rule on the *merits* of Plaintiffs' claims is a completely different legal issue from seeking permission to pursue their claims against agents of the Bankruptcy Court**.

*Mem. Op.* at page 20 (Emphasis added).

Following the District Court's language, Plaintiffs seek a limited finding in this Court that the Complaint is "not without foundation." With the sole exception of the Barton Doctrine, Plaintiffs' assert this Court's subject matter jurisdiction over the Complaint is wanting. *See Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3d Cir.1984) (giving rise to the "Pacor Test"), a seminal case

that "does not set out the exclusive test for bankruptcy subject matter jurisdiction." *See also, In re Bell*, 476 B.R. 168, 174 (Bankr. E.D. Pa. 2012) (further limiting the Court's Subject Matter Jurisdiction); and *In re W.R. Grace &amp; Co.*, 607 B.R. 419, 423 (Bankr. Del. 2019) ("bankruptcy courts always have jurisdiction over derivative claims, but rarely have jurisdiction over those that are nonderivative.").[8]

It is the Defendants' burden to establish jurisdiction over the merits of Plaintiffs' claims. "Nuveen is correct that the party asserting a federal court's jurisdiction bears the burden of proving that jurisdiction exists..." *Nuveen Mun. Trust ex rel. Nuveen High Yield Municipal Bond Fund v. Withumsmith Brown*, P.C., 692 F.3d 283, 293 (3rd Cir. 2012).

The record of proceedings herein shows that there will be no distributions to unsecured creditors of the Chapter 7 Case. Subject Matter Jurisdiction no-asset Chapter 7 cases are severely limited. *See In re Eltech, Inc.*, 313 B.R. 659 (Bankr. W.D. Pa. 2004) (*sua sponte* dismissal of an adversary proceeding because "the Court was divested of such subject matter jurisdiction … [when the case] was converted from Chapter 11 to Chapter 7 and the Chapter 7 Trustee for such case had concluded that there were no assets to administer for the benefit of creditors.); *In re Shuman*, 277 B.R. 638,650-651 (Bankr. E.D. Pa. 2001) (applying the Pacor Test in a no-asset chapter 7 case — which means that no assets will be distributed to unsecured creditors — generally there is no reason to hear a challenge to a creditor's unsecured proof of claim, even if raised by the debtor, since the allowance of the claim is irrelevant to the administration of the case.); "In a chapter 7 liquidation case, if it appears from the schedules that there are no assets from which a dividend can be paid, the notice of the meeting of creditors may include a statement to that effect; that it is unnecessary

---

[8]  The Third Circuit relied upon the fact that claims were nonderivative to distinguish the claim from a prior adjudication. *In re Combustion Engineering Inc*, 391 F3d at 229 (also relying upon that the other case could alter the priority of creditors).

to file claims; and that if sufficient assets become available for the payment of a dividend, further notice will be given for the filing of claims." FRBP 2002(e); see also FRBP 2002(h)(3).[9]

There is no likelihood and no possibility of distributions to unsecured creditors. This Court's subject matter jurisdiction is constrained by the fact that this case has been a no-asset case since 2010, when Plaintiff Prosser's most valuable asset, ICC, was sold to the Rural Telephone Finance Cooperative ("RTFC").

### The Defendants' Obligation as Fiduciaries to Seek Court Direction

The Chapter 7 Trustee is an officer of the Court. *VistaCare*, 678 F.3d at 229-230 (3d Cir.) (The trustee remains, for all intents and purposes, an officer of the bankruptcy court); *Callaghan v. Reconstruction Finance Corp.*, 297 U.S. 464, 468 (U.S. 1936) (Trustees in bankruptcy are public officers and officers of a court...); *Swope*, 872 F.3d at 143 (3rd Cir.) ("the Chapter 7 Trustee is … an officer of the appointing Court" relying upon the Chapter 7 Handbook). Trustees are expressly recognized as an Officer of the Court by Bankruptcy Criminal Statutes (28 USC §§ 152(1), 152(9), 153(b), and 154). The Bankruptcy Criminal Statutes language reaches all Defendants.

It has long been decided that Parties whose engagement requires Court approval 11 U.S.C. § 327 and thus, look to receive compensation from the estate, are officers of the Court and Fiduciaries. "In all cases persons who seek compensation for services or reimbursement for

---

[9] Defendants have the burden of establishing that the outcome of the case will affect future distributions to Chapter 7 unsecured creditors. However, the Estate of Jeffrey J. Prosser was converted to a Chapter 7 proceeding on October 3, 2007. The last accounting publicly filed was made on July 8, 2014 (the "2014 Accounting"), over 7½ years ago. The Chapter 7 Estate has been in existence for over 14¼ years; nevertheless, based upon the 2014 Accounting, the Chapter 7 Estate has distributed exactly $0.00 to Chapter 7 Estate's unsecured creditors. The Chapter 7 Estate assets are subject to a $138 Million secure claim by Greenlight. The Chapter 7 Estate is being operated for the benefit of the Court-Appointed 7 Professionals and not for the benefit of the Estate's unsecured creditors.[9] The history of this case has demonstrated that this is a no-asset case because there has been no distribution made in over 14¼ years (the entity of the Chapter 7 proceeding) to unsecured creditors.

expenses are held to fiduciary standards." *Brown v. Gerdes*, 321 U.S. 178, 182, (U.S. 1944); *In re Count Liberty, LLC*, 370 B.R. 259, 280 (Bank. C.D. Cal. 2007) (*Same*).

The fiduciary duty runs to the Estate, not the Trustee:

> In the bankruptcy setting, trustee's counsel owes a higher fiduciary duty to the estate than to the trustee. *In re Johnson*, 1994 WL 163911, *2 (N.D.Cal.1994) (attorney retained under § 327 represents the estate and not the trustee in his individual capacity); see also *In re Rivers*, 167 B.R. 288 (Bankr.N.D.Ga. 1994) (when the interests of the debtor-in-possession conflict with those of the estate, it is the estate and the court to which the attorney owes his highest allegiance).

*In re Delta Petroleum (PR), Ltd.*, 193 BR 99 (D. P.R. 1996).

Here, the Shoys Wine Collection was undertaken after Defendants had concluded that it was not economically justified. Bankruptcy cases often involve conflicting interests wherein competing interests must be balanced by case-specific inquiry. *See In re BH & P Inc.*, 949 F.2d 1300, 1312-1313 (3d Cir. 1991) (where the Third Circuit balance a potential conflict against the economic benefit of having a single Trustee in jointly administered Bankruptcy cases).

The Third Circuit has held that "What counts is that the matter **not be left either to hindsight or the unfettered desires of the [parties involved]**, but that the bankruptcy judge is given **an immediate opportunity** to make an intelligent appraisal of the situation and to apply his experience, common sense, and knowledge of the particular proceeding...." *Id.*, 949 F.2d at 1313. There can be no immediate opportunity for the Court to make an intelligent appraisal without timely and candid disclosure.

From the Defendants' status as officers of the Court flows obligations and benefits. The Defendants' have Fiduciary a responsibility in the discharge of their responsibilities under the Code and the execution of Court orders. In turn, the Defendants' are entitled to compensation from the Estate and quasi-judicial immunity for are reasonable actions taken in the performance of their duties.

**The *Swope* Decision Regarding Quasi-Judicial Immunity**

*Phoenician Mediterranean Villa, LLC v. Lisa M. Swope, Esquire, Tr. of the Bankr. Estate of J&S Props., LLC (In re J&S Props., LLC)*, 872 F.3d 138 (3rd Cir. 2017) defined the scope of immunity for Court-Appointed Bankruptcy Professionals. In *Swope,* the Third Circuited departed from common law:

> While quasi-judicial immunity is rooted in the common law, … *Harlow* qualified immunity is not. A ***distinction*** between the two doctrines **exists** and it **should be observed**.

*Swope* 872 F.3rd at 147-148.

In *Harlow* the Supreme Court "**completely reformulated** qualified immunity… ." *Id*. Common law is out, and the analysis articulated in *Swope* determines the nature and scope of immunity. Citing lower court rulings <u>before</u> the *Swope* decision, this Court has held that "Chapter 7 trustees are generally afforded absolute immunity for actions taken pursuant to a court order." *Carroll v. Prosser*, 2016 Bankr. LEXIS 3316 at 6. The result – immunizing the actions - could have been proper because the subject order explicitly left the Court-Appointed 7 Professionals with no discretion – their duties became ministerial. However, after *Swope*, the application of absolute immunity was wrong. <u>After *Swope*, absolute immunity is no longer applicable</u>.

First and foremost, *Swope* described a Trustee's liability for breach of fiduciary duty as a settled issue: "It is settled that a bankruptcy trustee may be held personally liable for breach of fiduciary duty. *Id*., at 150. *See also Mosser v. Darrow,* 341 U.S. 267, 271, 274, 71 S. Ct. 680, 95 L. Ed. 927 (1951); … ." The inquiry should be whether there was a breach of one or more of fiduciary duties and the scope of qualified immunity if any.

Second, "qualified rather than absolute immunity is sufficient to protect government officials in the exercise of their duties." *Swope* 872 F.3rd at 146-147. The Third Circuit found that "The Supreme Court has thus admonished that the extension of absolute immunity should be 'quite

sparing' and not extended 'any further than its justification would warrant.'" *Id.*

Third, the Third Circuit held the Supreme Court's reformulated test replaced "the inquiry into subjective malice so frequently required at common law with an **objective inquiry into the legal reasonableness of the official action**." *Swope* 872 F.3rd at 147-148 (citing *Anderson v. Creighton*, 483 U.S. 635, 645 (1987)). The actor's intent is no longer relevant, *e.g.* unplugging the air conditioner cooling the Shoys Wines is an objective fact; Defendant Antin's intent is not relevant.

The foregoing is "the ''touchstone, for the applicability of judicial immunity, namely, 'the performance of the function of resolving disputes between parties, or of authoritatively adjudicating private rights.'" *Swope* 872 F.3rd at 147-148 (internal citation omitted).

"Chapter 7 bankruptcy trustees should be accorded quasi-judicial immunity for actions taken within the scope of their duties that **are necessary** to the bankruptcy court's adjudication of a debtor's estate." *Swope* 872 F.3rd at 149 (Emphasis added). The source of the Trustee's duties can be found in the statutes and/or Court orders. The boundary of qualified immunity is the *scope of their duties*; hence, the Third Circuit held "quasi-judicial immunity of bankruptcy trustees does not extend to acts by a trustee that are *ultra vires*." Unnecessary acts are *ultra vires*, *e.g.*, unplugging the air conditioner cooling the Shoys Wines was unnecessary.

In assessing whether a Trustee can be held liable for breach of their fiduciary duty the Third Circuit applies a reasonable person standard (*e.g.*, knew or should have reasonably known). *See Swope,* 872 F.3rd at 143. Hence, a violation of clearly established law is not immunized even if reasonable care is exercised. *Swope* limits immunization of actions to necessary and reasonable actions objectively assessed. Additionally, the actions must comport to the law and the Defendants' duties under Court order and/or the Code.

## **Immunity Requires Candid Disclosure and a Lawful Order**

Candid Disclosure: *Carroll v. Prosser (In re Prosser)*, 2016 Bankr. LEXIS 3316 (the "Flight Art Case") addressed immunity that is directly linked to a Court Order. Plaintiffs refer to this form of quasi-judicial immunity as "Order Immunity;" which applies when the Order specifically vests the Trustee with only ministerial duties, *i.e.*, the Trustee is with left with little or no discretion.

In the Flight Art Case, the Trustee sought, and obtained, a Court Order that reduced the Trustee's actions to the fulfillment of ministerial duties, rather than discretionary duties. In the Flight Art Case, the Trustee made candid disclosures to the Court and the Prossers. Court-ordered immunity applies if the Order is lawful and for a lawful purpose.

This case is, however, readily distinguishable. The February 9, 2011 Turnover Order is a generalized Order which imbued the Trustee with considerable discretion. As the Trustee's knowledge evolved of the cost, logistics, and the necessary value threshold, *etc.*, difficult questions arose – but there was no disclosure to the Court or the Prossers. "Only after such disclosure has been made, and the court is aware of the pertinent facts, **does judicial approval become meaningful**." *In re San Juan Hotel Corp.,* 847 F.2d 931, 942 (1st Cir. 1988): *In re Big Rivers Elec. Corp.*, 355 F.3d 415, 443 (6th Cir. 2004) (*Same*).

In the Flight Art Case, this Court held: "To have immunity, the Trustee must establish that: (1) the trustee's acts were within the scope of his or her authority; (2) the **debtor had notice** of the trustee's proposed acts; (3) the trustee **candidly disclosed** the proposed acts to the bankruptcy court; and (4) the bankruptcy court approved the trustee's proposed acts." *Supra,* at *6. This Court cited several cases including *Harris v. Wittman (In re Harris)*, 590 F.3d 730, 742 (9th Cir. 2009) which adopted the four-prong test. See also, *In re Summit Metals, Inc.*, 477 B.R. 484, 501 (Bankr.

D. Del. 2012) (adopting the four-prong test). In *Swope*, the Third Circuit cited *Harris* (the same page cited by this Court) for the proposition "that bankruptcy trustees are covered by quasi-judicial immunity when acting pursuant to an express court order." *Id*., 872 F. 3d at 151.

While the four-factor test has not been universally adopted, there is a fiduciary duty of candid disclosure, to wit: "[Fiduciary] obligations include '[o]pen, honest and straightforward disclosure to the Court and creditors..." *In re Marvel*, 140 F.3d 463 (3rd Cir. 1998). All Courts tie immunity to disclosure, to wit: "a trustee acting with the explicit approval of a bankruptcy court is entitled to absolute immunity, as long as there has been full and frank disclosure to creditors and the court." *In re Mailman Steam Carpet Cleaning Corp.,* 196 F.3d 1, 8 (1st Cir. 1999). See also, *5 Collier Bankruptcy Practice Guide P 86.26* (For a trustee to be entitled to such immunity, the court order must be based upon candid disclosure of all relevant facts and notice to parties in interest). Full and frank disclosure rests upon the Supreme Court holding that "the practice is well established by which trustees seek instructions from the court, given upon notice to creditors and interested parties, as to matters which involve difficult questions of judgment." *Mosser v. Darrow*, 341 U.S. 267, 274, 71 S. Ct. 680, 683 (1951). The Duty of disclosure runs to all Defendants. See *Mushroom*, 382 F.3d at  (3rd Cir.) (a fiduciary, because of his position of trust, would have an affirmative duty to the principal to disclose the fraud. Absent a disclosure, the fiduciary commits an act of continual covering up of the fraud.)

Failure of the Defendants to disclose is not a waiver of the quasi-immunity defense for actions taken without disclosure; however, nondisclosure means there is an assumption of risks. More importantly, the Turnover Order is not and cannot shield the Trustee from liability for the many discretionary acts undertaken without full and fair disclosure to the Court and the Prossers. The Trustee's failure to seek further instruction from this Court respecting the Shoys Wines

Collection removes the shield of Order Immunity. The Defendants have assumed the risk of their discretionary decision-making concerning the Shoys Wines.

Lawful Order or *Ultra Vires* Order:  There is also a much larger question:  was the Turnover Order lawful? Was it within this Court's authority to authorize collection of the Shoys Wines? The short answer is:  no. Without a lawful Court Order, the Chapter 7 professionals could not legally seize the property underlying Plaintiffs' Complaint.

The Turnover Trial commenced before the August 17, 2010 Final Order selling the last of ICC's operating companies.[10] The Trustee should have then filed a Notice of No Distribution before the 2011 Turnover Order. The Court knew that the sale of the ICC operating companies according to RTFC's credit bid meant that there would be no distribution to the Chapter 7 Estate. The Chapter 7 Estate was a no distribution case.

The Chapter 7 Trustee is without authority to act as liquidating agent for a secured creditor. *See Dudley v. Easton*, 104 U.S. 99 (U.S. 1881) (An assignee in bankruptcy represents the general or unsecured creditors, and his duties relate chiefly to their interests. He is in no respect the agent or representative of secured creditors ….); *Congress Credit Corp. v. AJC Int'l*, 186 B.R. 555 (D.P.R. 1995) (It is a fundamental concept in bankruptcy that a trustee's primary duty is to the unsecured creditors rather than to the secured creditors. A Chapter 7 trustee should not act as a mere conduit for the benefit of secured creditors only*.); Merrill Lynch Bus. Fin. Servs. v. Kupperman*, 2010 U.S. Dist. Lexis 52785 (D.N.J. May 27, 2010) (in accord); *In re Feinstein Family Pshp.*, 247 B.R. 502 (Bankr. M.D. Fla. 2000) (the Bankruptcy Code never contemplated that a Chapter 7 trustee should act as a liquidating agent for secured creditors); *In re Walter Steven*

---

[10]  An April 6, 2009, Hearing granting preliminary approval of the credit bid indisputably established that there would be no recovery for the Chapter 11 unsecured creditors and the Chapter 7 Estate which has the lowest priority. 11 U.S.C. § 726(a)(6).

*Rambo*, 297 B.R. 418 (Bankr. E.D. Pa. 2003) (The Chapter 7 trustee's primary role is to liquidate property for the benefit of unsecured creditors and not for the benefit of secured creditors or the debtor.) As set forth hereinafter in the abandonment section, the Chapter 7 Handbook is in accord with the above case law.

The Bankruptcy Court was without legal authority to authorize the Shoys Wines Collection. *See Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 206-207 (U.S. 1988) (Whatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of the Bankruptcy Code); *In re Columbia Ribbon Co.*, 117 F.2d 999, (3d Cir., February 5, 1941) (Equitable powers are to be exercised within the limits laid down by the Bankruptcy Act and subject to its specific provisions. The court may not … set aside the clear congressional mandate that no such priority shall be accorded.); and *In re Amco Ins.*, 444 F.3d 690 (5th Cir. Tex. 2006) (A court's powers under 11 U.S.C.S. § 105(a) are not unlimited. Section 105(a) does not permit courts to act as roving commissions to do equity.)

The Turnover Order to the extent it authorized the Shoys Wine Collection was void. The Third Circuit has held: "[a] judgment may indeed be void … if the court that rendered … a decree which is not within the powers granted to it by the law. *United States v. Zimmerman*, 491 F. App'x 341, 344 (3d Cir. 2012) (citing *Marshall v. Bd. of Ed., Bergenfield, N.J.*, 575 F.2d 417, 422 (3d Cir. 1978)). "Thus, we have indicated that a judgment will be rendered void for lack of subject matter jurisdiction only where there is a total want of jurisdiction or in the rare instance of a clear usurpation of power." *Id*. (citations omitted).

The Shoys Wine Collection was *ultra vires* and thus not immunized.

## The Chapter 7 Trustees Fiduciary Duty to ALL Parties

The Supreme Court has held that "the fiduciary duty of the trustee runs to shareholders as

well as to creditors." *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 355 (1985). PL Prosser's status as an individual Chapter 7 Debtor, in contrast to a corporate debtor, does not alter this fiduciary duty. The Third Circuit holds "it is the trustee's duty to both the debtor and the creditor to realize from the estate all that is possible for distribution among the creditors." *In re Martin*, 91 F.3d 389, 394 (3d Cir. 1996). In subpart (6) of 11 U.S.C. 726(a), the statute provides the property of the estate shall be distributed to "sixth, to the debtor." Chapter 7 Handbook (2012) instructs:

> The trustee is a **fiduciary** charged with protecting the interests of all estate beneficiaries – namely, all classes of creditors, including those holding secured, administrative, priority, and non-priority unsecured claims, **as well as the debtor's interest in exemptions and in any possible surplus property**.

At page 4-2. See also, *In re WHET, Inc.*, 750 F.2d 149 (1st Cir. 1984) (A trustee … owes a fiduciary duty to debtor and creditors alike to act fairly and protect their interests.); *In re Dow Corning Corp.*, 255 B.R. 445, 523 (E.D. Mich. 2000) ("A Chapter 7 trustee's fiduciary duty goes to both the creditors and the debtor … .").

If abandonment was the proper course of conduct, then the Shoys Wines were surplus property. The Defendants were in a direct fiduciary relationship with the Prossers. The Trustee was the Prossers' custodian of the Shoys Wines. 11 U.S.C. 101(11).

The 11th Circuit ruled in *In re Davis*, 899 F.2d 1136, 1145, N15 (11th Cir. 1990)  that:

> A bankruptcy estate is a completely different creature. The bankruptcy trustee does not represent the interests of the debtor alone; rather, he owes a complex set of obligations and fiduciary duties to the court, the debtor, the shareholders (in the case of a bankrupt corporation), and, most importantly, the creditors.

The Honorable Steven Rhodes, in his article *The Fiduciary and Institutional Obligations of a Chapter 7 Bankruptcy Trustee*, 80 Am. Bankr. L.J. 147 (2006) (the "Article"), distinguishes between the obligations owed to parties and the Trustee's "institutional obligations to the bankruptcy process itself." The Article describes these Institutional Obligations as protecting the integrity of the bankruptcy process.  – as:

> … to oppose the debtor's discharge if advisable, to report bankruptcy crimes, to possess integrity and good moral character, to be free of prejudice, to be financially responsible, to be trustworthy, to refuse gifts offered to influence the trustee's official actions, to comply with the standards of conduct of the trustee's profession, and to provide regular reports on their administration of cases.

*See Article, at* 203.

The Article cites seven reasons why Trustees should be subject to the Code of Conduct for United States Judges, among which is the Trustee's derivative, quasi-judicial immunity. The Third Circuit notes that "judicial immunity is extended to officials other than judges when their judgments are functionally comparable to those of judges—that is, because they, too, exercise discretionary judgment as part of their function." *Swope,* 872 F. 3d at 149.

## The Fiduciary Obligation and the Current Litigation

Litigation tactics in bankruptcy proceedings are governed by the fiduciary obligations of the Trustee(s) and, by extension, their professionals that serve them. Citing Collier, the Third Circuit, in its opinion in *Century Indem. Co. v. Congoleum Corp. (In re Congoleum Corp.)*, 426 F.3d 675, 687 (3d Cir. N.J. 2005), held, in relevant part, that:

> Rules governing professional conduct are often viewed as even more necessary and applicable in bankruptcy cases than in other contexts.

*Id.,* 426 F.3d at 686.

> Bankruptcy professionals are required to examine their relationship not only based on the two-party litigation model, but also one guided by 'a stricter, fiduciary standard.'"

*Id.,* 426 F.3d at 687.

*See In re Nathan & Miriam Barnert Mem. Hosp. Ass'n*, 2009 Bankr. LEXIS 3017 (Bankr. D.N.J. Sept. 21, 2009) (Bankruptcy professionals are required to examine their relationship not only based on the two-party litigation model, but also one guided by 'a stricter, fiduciary standard'): *In re Jeep Eagle 17, Inc.*, 2009 Bankr. LEXIS 3614 (Bankr. D.N.J. July 13, 2009) (same).

## The Absolute Requirement to be Free of Conflict

Nearly 100 years ago, the Supreme Court noted that there should be no 'friendly'

receiverships, because the receiver is an officer of the court and should be as free from 'friendliness' to a party as should the court itself." *Harkin v. Brundage*, 276 U.S. 36, 55 (U.S. 1928).

The Supreme Court requires Trustees and their counsel to act *as … the court itself*. One Bankruptcy Judge noted, "although a trustee is a private party and not a judge, there are several reasons why it is appropriate to consider guidance from the Code of Conduct for United States Judges as well as the advisory opinions of the Committee on Codes of Conduct of the Judicial Conference of the United States." *See The Fiduciary and Institutional Obligations of a Chapter 7 Bankruptcy Trustee* by Hon. Steven Rhodes, 80 Am. Bankr. L.J. 147 (Citations omitted). The basis for quasi-immunity, when applicable, is derivative because the Bankruptcy Trustee "… performs some functions historically viewed as judicial in nature…." *In Re Castillo*, 297 F.3d 940, 951 (9th Cir. Cal. 2002).

The Bankruptcy Code explicitly requires that the Defendants must be a disinterested person. 11 USC § 101(14); 327(a). The Third Circuit has approved the removal of a Trustee *for cause* for as little as an unintentional breach of the duty of disclosure. *See B H & P INC.*, 949 F.2d 1300 (3d Cir. N.J. 1991). (The court affirmed because, upon review of the merits of the appeal, the court found no error in the disqualification of the appellants [Trustee and counsel], although appellants committed an unintentional breach of the duty of disclosure.) The Third Circuit has held that one cannot serve as either trustee and/or attorney if **at any time** they are no longer disinterested. *See United States Trustee v. Price Waterhouse*, 19 F.3d 138 (3d Cir. Pa. 1994) (The Bankruptcy Code, *11 U.S.C.S. § 328(c)* means that if a non-"disinterested" professional person is improperly employed, or if a professional person ceases to be "disinterested" "at any time during such professional person's employment, the court may deny compensation and reimbursement).

The Chapter 7 Handbook (2012), at p. 2-7, states:

A trustee must be knowledgeable of sections 701(a)(1), 101(14), and 101(31), as well as any other applicable law or rules, and must decline any appointment in which the trustee has a conflict of interest or lacks disinterestedness. The trustee must have in place a procedure to screen new cases for possible conflicts of interest or lack of disinterestedness upon being appointed. 28 U.S.C. § 586.

If a trustee discovers a conflict of interest or a lack of disinterestedness after accepting the appointment, the trustee shall immediately resign from the case. Conflict waivers by either the debtor or creditor do not obviate the trustee's duty to resign.

This requirement underlies the discharge of all the Trustee's duties, and the reasonable person test must be integrated with the requirement of a disinterested party, e.g., what would a reasonable, non-interested person do in the same situation. The issue of conflict becomes highly relevant once the VIPD Shoys Wines Criminal Investigation commenced.

## A Fiduciary's Duty to Maximize the Estate

"Along with those powers, of course, comes the trustee's fiduciary duty to maximize the value of the bankruptcy estate." *Cybergenics Official Committee*, 330 F.3d at 573 (3d Cir) (*en banc*). See, *In re Mushroom*, 382 F.3d at (3rd Cir.) (there is no question that Mushroom [DIP], acting through its representatives ..., had a fiduciary duty to protect and maximize the estate's assets); *Hartford,* 530 U.S at 12 (the trustee is obliged to seek recovery under the section whenever his fiduciary duties so require): *In re Martin,* 91 F.3d at 394 ("it is the trustee's duty to **both** the debtor and the creditor to realize from the estate all that is possible for distribution among the creditors..."). This Court has held: "The duty to maximize the value of the estate is **central** to a trustee's fiduciary role." *Carroll v. Prosser*, 2016 LEXIS 3316 at 10.

The Hon. Steven Rhodes, in his article, *The Fiduciary and Institutional Obligations of a Chapter 7 Bankruptcy Trustee*, 80 Am. Bankr. L.J. 147 (2006), states:

Many cases refer to the trustee's "duty to maximize the value of the estate." The more accurate formulation of this duty, however, is that the trustee is required to maximize the distribution of the estate. While this certainly requires the trustee to maximize the value of

the estate, it also requires the trustee to minimize the administrative expenses of the estate. As the Seventh Circuit explained, the trustee's "duty is to endeavor to maximize the value of the estate ... which is to say the net assets. The performance of this duty will sometimes require [the trustee] to forbear attempting to collect a particular asset, because the costs of collection would exceed the asset's value." The court further explained that this duty is "not merely care, diligence, and skill in the prosecution of the estate's claims. It is also care, diligence, and skill in deciding which claims to prosecute, and how far."

*Id.*, 80 Am. Bankr. L.J. at 164-165 (footnotes omitted).

Cites included *In re Martin*, 91 F.3d 389, 394 (3d Cir. 1996) which held:

However, a trustee has a fiduciary relationship with all creditors of the estate. See *Weintraub*, 471 U.S. at 354-55, 105 S.Ct. at 1993-94. Indeed, under the Code a trustee must investigate all sources of income for the estate and "collect and reduce to money the property of the estate." 11 U.S.C. § 704(1). She has the duty to maximize the value of the estate, *Weintraub*, 471 U.S. at 353, 105 S.Ct. at 1993, and in so doing is "bound to be vigilant and attentive in advancing [the estate's] interests." *In re Baird*, 112 F. 960, 960 (E.D.Pa.1902). In sum, "it is the trustee's duty to both the debtor and the creditor **to realize from the estate all that is possible for distribution among the creditors**." 4 Collier on Bankruptcy p 704.01 (15th ed.1993).

*Id.*, 91 F.3d at 394.

As noted within this MOL, in a situation where the bankruptcy has no assets and thus,

bankruptcy courts have nothing to distribute to unsecured creditors, the Bankruptcy Court's subject

matter jurisdiction is extremely limited. As the Seventh Circuit has held:

It should go without saying that neither the trustee in bankruptcy nor the trustee's lawyer has a duty to collect an asset of the debtor's estate if the cost of collection would exceed the value of the asset.  His duty is to maximize the value of the estate, which is to say the **net assets**. The performance of this duty will sometimes require him to forbear attempting to collect a particular asset, because the costs of collection would exceed the asset's value. Put differently but equivalently, the care, diligence, and skill that a lawyer for the debtor's estate, like the trustee himself, is required to bestow as part of his fiduciary duty is not merely care, diligence, and skill in the prosecution of the estate's claims. It is also care, diligence, and skill in deciding which claims to prosecute, and how far. This duty placed Aimen under an obligation to his client, the debtor's estate, to abandon the preference suit once it became reasonably obvious that further litigation would cost more than it was likely to bring into the estate.

*In re Taxman Clothing Co.*, 49 F.3d 310, 316 (7th Cir. 1995) (internal citations were omitted; emphasis added).

In deciding to convert a Chapter 11 proceeding into a chapter 7 proceeding, the Third Circuit adopted the Seventh Circuit's holding, to wit:

> Prolonging this case will only burden the estate with mounting attorney and administrative fees. Cf. *Matter of Taxman Clothing Co*., 49 F.3d 310, 315 (7th Cir.1995) ("[N]either the trustee in bankruptcy nor the trustee's lawyer has a duty to collect an asset of the debtor's estate if the cost of collection would exceed the value of the asset. His duty is to endeavor to maximize the value of the estate, **which is to say the net assets**. The performance of this duty will sometimes require him to forbear attempting to collect a particular asset, because the costs of collection would exceed the asset's value." (internal quotation marks and citations omitted)).

*In re Am. Capital Equip., LLC*, 688 F.3d 145, 163 (3rd Cir. PA. 2012) (Emphasis added).

Like the facts of this case, the facts in *Taxman* involved multi-year delay in the distributions to unsecured creditors and estate almost entirely consumed by fees.

## The Fiduciary's Duty of Due Diligence

Title 11 U.S.C. § 704(a)(1) mandates that the "trustee shall – (1) … close such estate as **expeditiously** as is compatible with the best interests of parties in interest." This statutory provision coupled with common law fiduciary duties imposes a duty of diligence.

Of the Duty of Diligence, the Chapter 7 Handbook concisely summarizes the consequences of delay in administering assets in Chapter 7:

> Delays in case closure diminish the return to creditors, undermine the creditors' and public's confidence in the bankruptcy system, increase the trustee's exposure to liability, raise the costs of administration, and, in cases involving non-dischargeable pre-petition tax liabilities, expose the debtor to increased penalties and interest. Delays also give rise to public criticism of the bankruptcy process.
>
> The trustee's diligence in closing the estate is also important in the debtor's fresh start.

*Id.*, 80 Am. Bankr. L.J. at 168-170 (footnotes omitted).

The Third Circuit has held that "under the Code a trustee must … and in so doing is 'bound to be vigilant and attentive in advancing [the estate's] interests.'..." *In re Martin*, 91 F.3d 389, 394 (3d Cir. 1996). Citing a Tenth Circuit opinion, a Bankruptcy Court held:

> Generally, the standard is the exercise of due care, diligence, and skill both as to affirmative and negative conduct. Where the trustee is negligent or willful and fails to meet the standard of care required of him, he is liable for loss. The standard or measure of care, diligence and skill is that of an ordinarily prudent man in the conduct of his private affairs under similar circumstances and with a similar object in view.

*See In re Nadler*, 8 B.R. 330, 333-334 (Bankr. E.D. Pa. 1980) ("The standard of care imposed upon bankruptcy trustees, for the execution of their fiduciary obligations, has been defined by the courts as one of 'due diligence,'..." [citations omitted])

Acting derivatively as an extension of this Court, in the performance of quasi-judicial duties, the Defendants must be held to the same high standards this Court self-imposed by adherence to the Code of Conduct for United States Judges.

**The Fiduciary's Duty of Supervision**

The Third Circuit has held:

> The Bankruptcy Code commands the debtor in possession (or the trustee) to be the captain of the debtor ship. *See* 11 U.S.C. § 1108. While the debtor in possession may assign to others specific duties, it may not surrender the helm and let the debtor ship sail under someone else's captaincy.

*Mushroom*, 382 F.3d at 331, 339 (3rd Cir.)

In *Mushroom,* the Third Circuit noted that the lower courts linked reasonable diligence standards with the duty to safeguard assets. The Third Circuit did not reject the linkage but found that specific Court orders in the case might have justified the relaxation of the duty to supervise making the issue of whether the Trustee should be held liable for the Estate counsel's embezzlement a jury question.

The Chapter 7 Handbook states:

> It is critical that the trustee oversees the work performed by professionals and exercises appropriate business judgment on all key decisions.  The trustee must actively supervise estate professionals to ensure prompt and appropriate execution of duties, compliance with required procedures and reasonable and necessary fees and expenses. 28 U.S.C. § 586, 28 C.F.R. § 58.6(a) (7).

> The trustee is advised to pay particular attention to the activities of professionals who are

not closely regulated by state authorities or who take physical possession of estate property and funds, such as auctioneers, liquidators, brokers, collection agents and property managers. The general standards for supervising auctioneers (see Handbook Chapter 4.C.10.g) apply equally to other professionals who take possession of estate funds and property.

*Id.*, page 4-21.

The Trustee is the only other person other than the Court who, under 18 U.S.C. § 3057(a), has an explicit duty upon *having reasonable grounds for believing that any violation under chapter 9 of this title* to make a criminal referral. In the circumstances regarding Shoys Wines, the Trustee utterly failed to fulfill this statutory duty. The Trustee is acting in concert with the other Defendants in every aspect of Shoys Wine Collection, False Account, and Shoys Wines Coverup. Plaintiffs should have been protected by this mandatory duty of criminal referral. Instead, they became the object of the Trustee's conflict of interest in which the Trustee failed to pursue criminal wrongdoing against the Prossers and the Chapter 7 estate.

## The Role of Equity

Following the United States Supreme Court, the Third Circuit, has made it clear that bankruptcy courts are courts that sit in equity.

The Supreme Court has long recognized that bankruptcy courts are equitable tribunals that apply equitable principles in the administration of bankruptcy proceedings. *See Local Loan Co. v. Hunt*, 292 U.S. 234, 240, 78 L. Ed. 1230, 54 S. Ct. 695 (1934) ("[C]ourts of bankruptcy are essentially courts of equity, and their proceedings inherently proceedings in equity."). The enactment of the Code in 1978 increased the degree of regulation Congress imposed upon bankruptcy proceedings, but it did not alter bankruptcy courts' fundamental nature. See H.R. Rep. No. 95-595, at 359 (1977), reprinted in U.S.C.C.A.N. 5963, 6315 (stating that, under the Bankruptcy Code, "[t]he bankruptcy court will remain a court of equity") (citing *Local Loan Co.,* 292 U.S. at 240). Any lingering doubt on that point is dispelled by a string of post-enactment Supreme Court decisions -- *see Young v. United States*, 535 U.S. 43, 50, 122 S. Ct. 1036, 152 L. Ed. 2d 79 (2002) ("[B]ankruptcy courts [] are courts of equity and 'apply the principles and rules of equity jurisprudence.'") (quoting *Pepper v. Litton*, 308 U.S. 295, 304, 84 L. Ed. 281, 60 S. Ct. 238 (1939); *United States v. Energy Resources Co.,* 495 U.S. 545, 549, 109 L. Ed. 2d 580, 110 S. Ct. 2139 (1990) ("[B]ankruptcy courts, as courts of equity, have broad authority to modify creditor-debtor relationships.") -- and by the Code itself. See 11 U.S.C. § 105(a) ("The Court may

24

issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, *sua sponte*, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.").

*Cybergenics*, 330 F.3d 548, 567 (3d Cir. N.J. 2003)

Derivatively, *in the administration of bankruptcy proceedings* and more appropriately, in the context of the Court-Appointed 7 Professionals, equity must govern in the discharge of the professionals' administrative duties.

## Abuse of Federal Bankruptcy Jurisdiction

As is well-recognized, there are limits to the Bankruptcy Court's jurisdiction over the property of a Chapter 7 Estate. Those limits are particularly relevant here. Jurisdiction is limited to accomplishing the policy objectives of the Bankruptcy Code. 1 Collier on Bankruptcy P 1.01 (16th 2021). Bankruptcy involves two primary objectives:

- The Supreme Court has long and often stated that "[t]he principal purpose of the Bankruptcy Code is to grant a fresh start to the honest but unfortunate debtor" (Citations omitted);

- Through orderly and centralized liquidation or through reorganization or rehabilitation, creditors of equal priority receive ratable and equitable distributions designed to serve "the prime bankruptcy policy of equality of distribution among creditors of the debtor" (Citations omitted).

The 'fresh start policy objective' is set out by the Supreme Court in *In re Marrama*, 549 U.S. 365, 367 (2007). The 'equality of distribution policy objective' is set forth by the Supreme Court in *Union Bank v. Wolas*, 502 U.S. 151, 161 (1991).

The equality of distribution policy objective does not apply to secured property, to wit:

Codifying the rule of *Long* v. *Bullard*, 117 U.S. 617, 29 L. Ed. 1004, 6 S. Ct. 917 (1886), the Code provides that a creditor's right to foreclose on the mortgage survives or passes through the bankruptcy.

*See, Johnson v. Home State Bank*, 501 U.S. 78, 82-83 (1991).

That is why many of the claw-back provisions of the Code are effective against secured creditors in a Chapter 7 Estate when the property is fully secured. *In re Integra Realty Res., Inc.*, 354 F.3d 1246, 1267 (10th Cir. 2004) ('the proper focus in [§ 550(a)] actions are not on what the transferee gained by the transaction, but rather on what the bankruptcy estate lost as a result of the transfer.'); *Cain v. Mappa*, 142 B.R. 677, 686 (Bankr. D.N.J. 1992) (A fully-secured creditor will be paid in full under Chapter 7, so there is no avoidable preference in this case with or without a guarantee by an insider); *In re Tri-State Telecomms., Inc.*, 2012 Bankr. LEXIS 4832, at *35-36 (Bankr. E.D. Pa. Oct. 15, 2012) (When a defendant is fully secured, any transfer toward repayment of an antecedent debt is not preferential).

The Third Circuit has made clear what is to happen in a Chapter 7 Bankruptcy when a case, as is here, becomes a "no distribution case" (because the remaining assets are fully secured).

Courts agree that fully encumbered assets are unlikely to benefit the estate and therefore, such assets are not likely to be justifiably administered." *In re Lan Assocs. XI, L.P.*, 192 F.3d 109, 119-20 (3d Cir. 1999). See also, *In re Heritage Highgate, Inc.*, 679 F.3d 132, 143-44 (3d Cir. 2012) (increase in value of a mortgaged property during the pendency of the proceeding accrues to the benefit of the mortgagee). Without a possibility of a benefit to unsecured creditors, to hold and conduct trials under of common law theories to determine what is "property of the estate" allows for an expansion of jurisdiction by court decision, it "demonstrate(s) a 'clear abuse of discretion,' . . . , or conduct amounting to a judicial 'usurpation of [legislative rulemaking] power. . . '" *United States ex rel. Gohil v. Aventis Pharmaceuticals, Inc.*, 387 Fed. Appx. 143 (3d Cir. Pa. 2010) (*citing Mohawk v Carpenter,* 130 S. Ct. 599, 607.) See also, *Marshall v. Bd. of Educ.,* 575 F.2d 417, 422 (3d Cir. 1978) (a judgment may indeed by void … if the court that rendered it lacked jurisdiction

of the subject matter or the parties or entered a decree which is not within the powers granted to it

by the law). The secured assets should be immediately abandoned.

One reason for this policy, articulated by the Tenth Circuit, is:

As explained by the First Circuit, "bankruptcy courts have defined the equity that justifies a sale of property, consistently and explicitly, in one way: the value remaining for unsecured creditors above any secured claims and the debtor's exemption." This "equity for unsecured creditors" is what authorizes a trustee to exercise his powers of sale under § 363 **in the first place, because liquidation should not be for the benefit of the estate's secured creditors.** Therefore, a trustee's negotiation of a carve out with a secured creditor as a means of creating the equity necessary to justify the sale of fully encumbered estate property is suspect and **presents opportunities for collusion (emphasis added).**

*In re Bird*, 577 B.R. 365, 378 (B.A.P. 10th Cir. 2017).

The Chapter 7 Handbook speaks about the abandonment of fully secured property in

mandatory terms. When all the property left in Chapter 7 Estate is fully secured, the Court's

jurisdiction comes into focus. The Supreme Court has held:

Federal courts are courts of limited jurisdiction. They possess only that power authorized by Constitution and statute, which is not to be expanded by judicial decree. It is to be presumed that a cause lies outside this limited jurisdiction, and the burden of establishing the contrary rests upon the party asserting jurisdiction.

*Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) (internal citations omitted).

The 'equality of distribution policy objective' is relevant and jurisdictional. <u>The Bankruptcy Court cannot by judicial decree assume the sole role of providing a federal forum for the secure creditor to liquidate the Estates secured property</u>.

The Pacor Test is generally applied when new controversies arise; however, it also has the

same relevance to existing controversies when intervening events arise making it evident that the

Chapter 7 Case has become a no distribution case. FRCP 12(h)(3) made applicable to the Turnover

Proceeding by FRBP 7012 makes dismissal of the T.O. Adv. warranted. When events during a

course of a proceeding make it evident that the case will have no distribution to unsecured creditors

27

and thus, no conceivable impact upon the estate, the proceeding should abandon all secured property.

Comity with State courts and respect for State law demands that controversies between the secured party and the debtor concerning fully secured property should not be resolved by the Bankruptcy Court. *Stern v. Marshall*, 131 S. Ct. 2594, 2620 (U.S. 2011)  (Section 1334(c)(1) similarly provides that bankruptcy courts may abstain from hearing any proceeding, including core matters, "in the interest of comity with State courts or respect for State law").

## **Fraud Upon the Court**

The Third Circuit defined the elements of fraud upon the Court in 2005, to wit:

Actions for fraud upon the court are so rare that this Court has not previously had the occasion to articulate a legal definition of the concept. The concept of fraud upon the court challenges the very principle upon which our judicial system is based: the finality of a judgment. The presumption against the reopening of a case that has gone through the appellate process all the way to the United States Supreme Court and reached final judgment must be not just a high hurdle to climb but a steep cliff-face to scale.

In order to meet the necessarily demanding standard for proof of fraud upon the court we conclude that there must be: (1) an intentional fraud; (2) by an officer of the court; (3) which is directed at the court itself; and (4) in fact deceives the court. We further conclude that a determination of fraud on the court may be justified only by "the most egregious misconduct directed to the court itself," and that it "must be supported by clear, unequivocal and convincing evidence."

*See Herring v. United States*, 424 F.3d 384, 386-387 (3d Cir. Pa. 2005) (Footnote & Citation omitted)

The Third Circuit has stated that a Court should accept help from any source to determine the truth when there has been a fraud upon the Court. *See Root Refining Co. v. Universal Oil Products Co.*, 169 F.2d 514, 525 (3d Cir. Del. 1948) (This court is entitled to whatever assistance is available to it in its effort to unearth the truth, and it is of no moment that Whitman's application may not have been promptly presented after it was informed as to the facts, since, as pointed out in *Hazel-Atlas Glass Co. v. Hartford Empire Co.*, 322 U.S. 238, 246 (1944), **the matter does not**

**merely concern private parties and issues of great moment to the public are at stake**) (Emphasis added).

## Issues Involving the Statute of Limitation

The VIDC has held that the RICO 'limitation statute' ("SOL") is 4 years and the CICO SOL is 5 years. *Charleswell v. Chase Manhattan Bank, N.A.*, 308 F. Supp. 2d 545, 562 (D.V.I. 2004). This case presents many SOL issues.

When considering SOL issues, several factors come into play. For instance, there is the accrual of the injury considering the pattern requirement and there is also tolling – two distinct concepts. There is also conduct that is continuing.

Recently, the Supreme Court brought clarity to what was a convoluted issue regarding the tolling of the statutes of limitations:  state claims filed in federal court following a dismissal of the federal claim *without prejudice*. It is a tolling decision that has great impact in this case. *Artis v. Dist. of Columbia*, 138 S. Ct. 594, 199 L.Ed.2d 473 (2018).

The Supreme Court found that 28 U.S.C. § 1367(d) tolled the SOL while the case was under consideration by a federal court. The Supreme Court found tolling "suspends the statute of limitations for two adjacent time periods: while the claim is pending in federal court and [28 U.S.C.§ 1367(d) added time] for 30 days post dismissal." *Id*., 138 S.Ct. at 603 (the "Artis Rule"). The Supreme Court referred to this tolling as "stopping the clock." As is relevant here, the Artis Rule provides that the period when the claim was before the VIDC, the SOL was tolled.

The Third Circuit has held in *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380 (3rd Cir. 1994) ("abrogated on other grounds by *Rotkiske v. Klemm*, 890 F.3d 422, 428 (3d Cir. 2018) (*en banc*)), that equitable tolling applies to three circumstances –

> Equitable tolling functions to stop the statute of limitations from running where the claim's accrual date has already passed. We have instructed that there are three

29

> principals, **though not exclusive**, situations in which equitable tolling may be appropriate: (1) where the defendant has actively misled the plaintiff respecting the Plaintiffs' cause of action; (2) where the plaintiff in some extraordinary way has been prevented from asserting his or her rights; or (3) where the plaintiff has timely asserted his or her rights mistakenly in the wrong forum.

*Id.* at 1387 (internal citations omitted and emphasis added) (the "*Oshiver's* 3 Grounds"). *See Rotkiske v. Klemm*, 890 F.3d 422, 428 (3d Cir. 2018) (*en banc*) (abrogating case on other grounds).

*Oshiver's* three grounds, sounding in equity should have even more application to Bankruptcy proceedings. Bankruptcy proceedings are *equitable tribunals that apply equitable principles in the administration of bankruptcy proceedings*.

The Artis Rule coupled with *Oshiver's* three grounds, more particularly, the 3rd ground (timely assertion but in the wrong forum), means the federal SOL was tolled while the case was before the VIDC; and the CICO SOL was tolled while the case was before the VIDC, plus an additional thirty (30) days. The logic for the tolling, that Plaintiffs cannot control the time frame of the Federal Court's consideration, prevents punishment for matters beyond the Plaintiffs' control. This application of case law is consistent with the finding that Bankruptcy Courts are equitable tribunals governed by equitable principles.

The *Oshiver's* three Grounds, more particularly, the 2nd ground (where the plaintiff in some extraordinary way has been prevented from asserting his or her rights) also has application to this case. *In re Mushroom*, 382 F.3d 325, 341 (3rd Cir. 2004) addresses a matter within the scope of the 2nd Ground (or another ground in the nonexclusive 3 Grounds) by holding that:

> Where a fiduciary commits an act of fraud against his principal, the statute of limitations will be tolled since the very position the fiduciary is in prohibits the principal from uncovering the fraud. Furthermore, the fiduciary, because of his position of trust, would have an affirmative duty to the principal to disclose the fraud. **Absent a disclosure, the fiduciary commits an act of continual covering up of the fraud** (Emphasis added).

<u>*Id*</u>., 382 F.3d at 341.

*In re Mushroom* involved circumstances where the Estate's attorney was embezzling Estate funds and, not surprisingly, hiding the embezzlement from the Trustee. While the circumstances the within case are distinguishable from *In re Mushroom*, Plaintiffs' case here is stronger than the facts involved in *Mushroom*. There, the tolling was premised upon an *absence of disclosure*. In Plaintiffs' case, as discussed in other parts of this MOL, Defendants owed a fiduciary duty to the Prossers. Instead of disclosing the Shoys Wine fraud, the Estate's professionals chose to conceal the fraud, a concealment that continues to this day. Like the logic underlying the *Arti* Rule where litigants cannot control federal courts' timing, the Prossers do not have a duty, because they have no ability, to supervise the Defendants. Based upon *In re Mushroom,* the Defendants are continuing the breach of their duty of disclosure. As such, the SOL is tolled.

Further, Plaintiffs Hobbs Act allegations are inchoate; because this is a continuing violation, the SOL has yet to have a date by which the SOL would commence. Thus, any action brought against Defendants sounding in RICO and/or CICO are within the Hobbs Act SOL. In RICO cases involving a continuing pattern of acts, there is no issue that bars Plaintiffs from suing for predicate acts that are not time-barred.

## Preclusion and Issues of Collateral Estoppel

The Third Circuit relies on a five-prong test to determine whether collateral estoppel applies to bar re-litigation of a fact or legal issue previously litigated. *See Wallace v. UPS*, 387 Fed. Appx. 127 (3d Cir. N.J. 2010). Issue preclusion, or collateral estoppel, bars the re-litigation of a fact or legal issue that has already been litigated. Issue preclusion applies where –

    (1) the issue presented in the present action is identical to the issue presented in the earlier action;

    (2) the first court or tribunal issued a final judgment on the merits;

    (3) the issue is asserted by the same party;

(4) the party had a full and fair opportunity to litigate the issue; and

(5) the determination of the issue was essential to the final judgment.

The adjudicating court does not have the authority to dictate to other courts the preclusive consequences of its judgment. The Second Circuit Court of Appeals addressed this issue holding:

> As Professor Wright's treatise explains, "ordinarily both issue preclusion and claim preclusion are enforced by awaiting a second action in which they are pleaded and proved by the party asserting them. The first court does not get to dictate to other courts the preclusion consequences of its own judgment.

*Covanta Onondaga v. Onondaga County Res. Recovery Agency*, 318 F.3d 392, 397-398 (2d Cir. N.Y. 2003) citing 18 Charles Alan Wright, et al., Federal Practice and Procedure: Jurisdiction § 4405, at 82 (2d  ed. 2002). *See Midway Motor Lodge  v.  Innkeepers' Telemanagement & Equipment Corp.*, 54 F.3d 406, 409 (7th Cir. 1995) *Motor Lodge v. Innkeepers' Telemanagement & Equipment Corp.*, 54 F.3d 406, 409 (7th Cir. 1995) ("In the law of preclusion, however, the court rendering the first judgment does not get to determine that judgment's effect").

Before this Court can address this issue, it must determine whether it, in fact, has jurisdiction to do so.

The issue of preclusion is further complicated by Plaintiff Oakland Benta's status as a party to this litigation but who is *not* a party in the bankruptcy proceeding. He was, at best, a witness in the Contempt Hearing. In such a situation the Third Circuit has held:

> Issue preclusion, or collateral estoppel, prevents parties from relitigating an issue that has already been actually litigated. … In its classic form, collateral estoppel also required "mutuality"-- *i.e.*, that the parties on both sides of the current proceeding be bound by the judgment in the prior proceeding. **Under the modern doctrine of non-mutual issue preclusion, however, a litigant may also be estopped from advancing a position that he or she has presented and lost in a prior proceeding against a different adversary**. For defensive collateral estoppel--a form of non-mutual issue preclusion--to apply, the party to be precluded must have had a "full and fair" opportunity to litigate the issue in the first action.

*See Peloro v. United States*, 488 F.3d 163, 174-175 (3d Cir. N.J. 2007) (Citations omitted & Emphasis added)

It is to be noted that PL Benta did not lose in a prior proceeding -- in fact, PL Benta *won*

in a prior proceeding: hence, non-mutual issue preclusion does not apply to PL Benta. The Third

Circuit has held that a "judgment that has been vacated, reversed, or set aside on appeal is thereby

deprived of all conclusive effect, both as res judicata and as collateral estoppel." *Stolt-Nielsen, S.A.*

*v. U.S.*, 442 F.3d 177, 187, n 7 (3rd Cir. 2006).

## ARGUMENT

### Plaintiffs' Claims

In *Swope*, the Third Circuit discussed three types of claims against the Trustee. The first

two were "breach of fiduciary duty claims brought by parties interested in the administration of

the estate and claims in tort or contract brought by third parties." *Id.,* 872 F.3d at 150. The third

type of claim involves *ultra vires* claims: "quasi-judicial immunity of bankruptcy trustees does not

extend to acts by a trustee that are *ultra vires*… .' *Id*., 872 F.3d at 151. If quasi-judicial immunity

applies, it applies to two classes of the three classes of claims: Breach of Fiduciary Duty and/or

Tort claims but not claims based upon Ultra Vires actions.

The Complaint sets out claims for (i) Constitutional torts; (ii) civil violations of the RICO

Act (defined in the Complaint); and (iii) civil violations of the Virgin Islands CICO Act (defined

in the Complaint).

In relationship to the *Swope* definition of claims, PL's claims involved all three classes

types of claims – Breach of Fiduciary Duty, Torts, and *ultra vires*. None of the claims rely upon

simple negligence but involve intentional acts. Even *ultra vires* acts were, objectively, intentional

acts.

### General Issues Involving Jurisdiction

As the VIDC noted, obtaining this Court's permission to sue does not empower this court

to adjudicate the claim. Rather, as *Swope* stated and the VIDC noted, this case is submitted for an

assessment of whether the Complaint's claims, Breach of Fiduciary and Intentional Torts, are 'not without foundation.' *VIDC Mem. Op.*, Threshold Jurisdiction. The VIDC further noted that obtaining permission to proceed does not mean this Court has the requisite jurisdiction to adjudicate the Complaint's claims.

First, among the jurisdictional issues, is whether the Defendants actions are *ultra vires.* If the Court agrees with the Plaintiffs' position, and the law would appear to so require, the entirety of the Shoys Wine Fraud was *ultra vires.* The Court's analysis should end with three findings: the Shoys Wine Fraud was *ultra vires*, this Court's permission is unnecessary because of the *ultra vires* finding, and the Court lacks further jurisdiction to adjudicate the claims.

**The Court's Lack of Jurisdiction:  It Was Beyond the Power of the
Court to Authorize the Shoys Wine Collection in the Turnover Order**

Chapter 7 Bankruptcy exists for purposes of the orderly liquidation of the Debtor's assets for the benefit of unsecured creditors, and to provide the Debtor with a fresh start. Both are based upon the Court's *in rem* jurisdiction. *Tennessee Student Assistance Corp. v. Hood*, 541 U.S. 440, 447 (2004) (discharge of a debt by a bankruptcy court is similarly an *in rem* proceeding). No distribution cases severely constrain the Court's jurisdiction for two reasons: (i) to the extent property is fully secured this Court has no authority over fully secure property except in limited circumstances which are not applicable in this case and (ii) fully secured property should be abandoned. *See* e.g., 11 U.S.C. 554. "Courts are in agreement that fully encumbered assets are unlikely to benefit the estate, and, therefore, such assets are not likely to be **justifiably administered**." *In re Lan Assocs. XI, L.P.*, 192 F.3d 109, 119-20 (3d Cir. 1999) (Emphasis added).

It is black letter law that a Court must examine its jurisdiction. The Supreme Court held that "subject-matter delineations [jurisdiction] must be policed by the courts on their own initiative even at the highest level." *Ruhrgas Ag v. Marathon Oil Co.*, 526 U.S. 574, 583 (U.S. 1999). See

also FRCP 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action..."); FRBP 7012(b) (applying FRCP 12).

The entry of the final Sale Order on August 10, 2010, authorizing the closing of a credit bid of the remaining operating assets of ICC foreclosed any possible distribution/dividend from the Chapter 11 Estates. The $138 Million Greenlight Secured Lien over all the Chapter 7 Assets indisputably means the Chapter 7 Case is and was then (a no distribution/dividend case, *i.e.*, there was no chance of any distribution to the Chapter 7 Estates unsecured creditor. The entry of the Chapter 11 Order coupled with Greenlight's secured creditor status over all the Estates assets divested the Bankruptcy Court of jurisdiction over the Turnover Adversary proceeding. FRCP 12(h)(3) applied to Bankruptcy proceedings by FRBP 7012(b).

The Trustee has no lawful authority to use the Chapter 7 Bankruptcy to act as the secured creditor's collection agent. Moreover, the Chapter 7 Trustee should have filed a No Distribution Notice and abandoned the secured assets. To not do so was, and remains, a breach of the Trustee's Fiduciary Duty.

To the extent authorized, the collection of the Shoys Wines the Turnover Order was beyond the authority of the Court because of want of jurisdiction. *See* also, *Reardon v. Leason*, 2010 U.S. App. LEXIS 23443 (3d Cir. N.J. Nov. 10, 2010) (A judgment may be void if the court that rendered it lacked jurisdiction over the subject matter or the parties or **entered a decree which was not within the powers granted to it by law.**)

The Turnover Order usurped the Courts of the Virgin Islands jurisdiction/authority over foreclosure and execution of judgments against real and personal property owned by Debtor

individually or by the Debtor and his wife jointly[11] which was located in the Virgin Islands. The Turnover Order is void.

Once it became indisputable that there would be no distribution to unsecured creditors, the property in the Chapter 7 Estate became surplus property, the Trustee owed Plaintiff/Debtor a fiduciary duty to file a No Distribution Notice and to abandon the property. The Trustee acted in contravention of his fiduciary duty. The Trustee became Greenlight's, the Secured Creditor's, collection agent using the bankruptcy process. The Turnover Over is not relevant to the issue of quasi-immunity because the breach of the Trustee's duty to abandon does not transmute *ultra vires* act into an act that may be immunized. In equity, a Trustee cannot benefit from his wrongdoing. The Trustee has no immunity for *ultra vires* acts and intent is not relevant.

The Shoys Wines Collection was both *ultra vires* and was an intentional act committed in breach of the Trustee's Fiduciary Duties.

## This Court's Lack of Jurisdiction: The *Pacor* Test

The Pacor Test examines "whether a lawsuit could `conceivably' affect the bankruptcy proceeding inquires whether the allegedly related lawsuit would affect the bankruptcy without the intervention of yet another lawsuit." Chronologically, the Chapter 11 Estates Sale Order was filed on August 17, 2010, and the Turnover Order was filed on February 9, 2011, almost seven (7) months after Sale Order. It is indisputable that at the very latest,[12] on August 17, 2010, the Chapter

---

[11] It cannot be disputed that matters involving local property ownership and effect of tenancy by the entirety is a matter that should be decided by Virgin Islands courts and not federal courts operating without *in rem* jurisdiction.

[12] On April 6, 2009 there was a hearing gave interim Court approval of RTFC's Credit Bid. After a world-wide marketing effort, it was established that RTFC could not recover more than $10 Million of its $492 Million Loan that was still carried on the National Utilities Cooperative Finance Corporation's financial statements. The hearing established that there would be no recovery from the Chapter 11 Estates for the benefit of the Chapter 7 Estate making it indisputable that the Chapter 7 Estate was a no-distribution estate.

7 Estate should have abandoned all assets to Plaintiff Prosser and have allowed Greenlight, the

secured creditor, to pursue collection against the Prossers in the Virgin Islands Courts.

Plaintiffs are suing the Defendants for acting as a collection agent for Greenlight by

pursuing the Shoys Wines Collection, for filing the False Account and Declaration about the July

29th Events (defined in the Complaint), and for the Shoys Wine Coverup, referred to collectively

as the Shoys Wines Fraud. Those acts occurred *after* the Trustee had a duty to abandon the Chapter

7 Assets and refrain from using the Chapter 7 proceedings for the benefit of Greenlight or

themselves, *e.g.*, fee generation.

Given the $138 Million secured claims, the Shoys Wine Collection, standing alone, would

provide *no* benefit to the unsecured creditors – and Greenlight would have priority to the Shoys

Wines proceeds. From the perspective and interest of the unsecured creditors of the Chapter 7

Estate, the Shoys Wines offer no possibility of any direct or indirect benefit and Plaintiffs' suit

could have no conceivable impact on the Estate. As such, there is no 'related to' jurisdiction.

**The July 2011 St. Croix Shoys Wine Collection**
**<u>Was a Sham on the Estate and the Court</u>**

Even if jurisdiction existed, the foregoing paragraphs establish that as a matter of law the

Shoys Wine Collection was undertaken, at best, to benefit Greenlight, the secured creditor. Further,

as a matter of uncontestable fact, the Shoys Wine Collection was undertaken for fee generation, to

embezzle Erte Cognac for some unknown party or both.

The Turnover Order provided no explicit instructions and the Defendants exercised

extensive discretion in the Shoys Wines Collection. Importantly, if not remarkably, even  before

their July trip to the Shoys Estate, the Defendants had determined that collecting and transporting

the Shoys Wines for the Christie's auction was economically unjustifiable. Having chosen to not

advise the Court of their determinations the Chapter 7 professionals assumed the risk of their

discretionary decisions for the Shoys Wine Collection.

As a result of their decision to proceed with what the Chapter 7 professionals had determined was economically unviable, it was no surprise that the Shoys Wine Collection and subsequent auction were financially catastrophic for the Estate. Even if the Shoys Wines Sanction Award was collectible the Shoys Wines Collection provided no benefit to the Estate. The Shoys Wines should have been abandoned.

The Complaint's allegations, which must be accepted as true, coupled with other facts of record primarily related to issues of jurisdiction, objectively established that the Shoys Wines Collection was not a product of incompetence – but rather was a series of intentional acts that  were contrary to law. Bankruptcy proceedings are meant to serve the interest of unsecured creditors providing an assets collection and distribution forum for unsecured creditors. The Defendants no further disclosure about the Shoys Wine Collection to the Court all of which support Plaintiffs' allegations, including that the Court-Appointed 7 Professionals were agents for and acting on behalf of the RTFC/Greenlight Retaliatory JV). *See Compl ¶ 26, 29* (PL Benta "was a target of the RTFC/Greenlight Retaliatory JV), and *Compl ¶ 30-32* (the Prossers were targets of the RTFC/Greenlight Retaliatory JV). Further, there is an admission that suggests the Shoys Wines Collection served an ulterior motive:  embezzlement of the Erte Cognac.

The Shoys Wine Collection was an intentional subterfuge, designed to mask an economically unviable product – and to blame the Prossers for the Chapter 7's inability to adequately collect, ship and ultimately, market the product. The Defendants should be stripped of their quasi-immunity, even if jurisdiction had existed. Examining the Shoys Wine Collection in the context of both the False Account and the Shoys Wines Coverup, there is ample support that the Shoys Wine Collection was to serve the ends of the RTFC/Greenlight Retaliatory JV – a joint

venture with unlawful retaliatory (within the meaning of 18 U.S.C. § 1513(e)).

It is undisputed that Christies determined that collecting and shipping the Shoys Wine Collection to New York was economically unjustifiable. Having adopted a "$300,000 Value Threshold" for the pickup, transportation, and Christie's auction of the Shoys Wines, *Compl. ¶ 49(e),(f),* Christies determined that it could never recover that amount from the Shoys Wines. In an email dated July 6, 2011, Defendants' determined that the best scenario was a value of $114,000 but that ". . . they are keeping the Erte, which brings it down to $82-114k." *Compl ¶ 49(c)*).

## Shoys Wine Collection was Under Color of Law

Multiple reasons are set forth above establishing that the Shoys Wine Collection, standing alone, was, as the Complaint alleges, under the color of law and thus, not shielded by quasi-judicial immunity. This includes, but is not limited to, that the collection of the wines was *ultra vires.* The Trustee had a clear legal duty to abandon the Shoys Wines, particularly since it was the Trustee's professionals had determined – well before they ever traveled to St. Croix – that traveling to the Shoys Estate would provide no benefit to the Estate and/or the unsecured creditors. Nevertheless, the Shoys Estate visit and the July 29th events were undertaken by the Chapter 7 professionals in an official capacity. They were performing functions under the auspices of a Court Order that was well beyond the power of the Court to issue. Such was known by the Defendants, presumably experienced bankruptcy professionals.

## The False Accounting to the Court

The False Accounting to the Court refers generally to reports made to the Bankruptcy Court regarding the events of July 29th.

*After* Defendants had determined that taking the Shoys Wine Collection to New York for auction (as was the consistent with the Court order) was not economically viable, but *before* the

actual trip to St. Croix occurred, the Chapter 7 professionals conspired to travel to St. Croix nonetheless to create an appearance of impropriety by the Prossers in how the wine was stored. It was clearly why Defendant Antin shut off the air conditioning in the Prossers' wine storage facility, notwithstanding his patently incredulous claim that he was "being green" by trying to save electricity.

The Trustee and his professionals knew beforehand that there could be no benefit to the Estate from the Shoys Wines. What followed confirms the object of the Shoys Wines visitation: sanctions and conversion of other property which is consistent with the RTFC/Greenlight scheme of retaliation against the Prossers.[13] What followed was the Trustee's Contempt Motion (referred to by Plaintiffs as the 'False Accounting).'

The False Accounting was simply that:  a false account in every material way of what occurred at the Shoys Estate. The False Accounting relied upon Def. Christie's dirty hands, to wit:

(i)      The July 6, 2011 Christie's email that disclosed a plan to improperly take very valuable Erte Cognac from the Estate;

(ii)     Christie's admission that it intended to destroy the Shoys Wines;

(iii)    Christie's perjurious sworn declaration supporting the Trustee's Contempt Motion and supporting the False Accounting to the Court; and

(iv)     Def. Antin's failure to correct his perjurious declaration made him a party to the Trustee's criminal referral of the Prossers that was premised upon Antin's knowingly false account.[14]

---

[13]  *See* Complaint, p. 2, FN 3, ¶ 66(p-q), 66(s-u), 77, 84-85, 89-91, 105.

[14]  Page 4 of the Complaint alleges – "CFC operates to protect its racketeering activities though retaliation designed to suppress and discredit anyone, like JProsser, that seeks to hold CFC accountable for its racketeering activities. Plaintiff JProsser became a target of the retaliation when he raised issues that implicated the Racketeering Activities. CFC commenced additional unlawful retaliatory acts (or lawful acts that served an unlawful purpose) directed at Plaintiff JProsser for the purpose of suppressing JProsser and discrediting JProsser ("Retaliatory Acts"). The Retaliatory Acts were also directed at associates of JProsser (the "Prosser Associates") including Plaintiff Oakland Benta."

Christie's was so conflicted that the Court later appointed wine experts to sample the Shoys

Wines. The engagement of the wine experts is, and should be, taken as an admission that Christie's

was not a disinterested entity.

Of particular relevance are three chronologically ordered dates:  the July Shoys Estate

visitation; the August 4th Trustee's filing of the Contempt Motion against PL Prosser, and the

September 3rd filing of a criminal complaint by PL Benta concerning Christie's unplugging the

cooling system for the wines at issue. This last event caused the VIPD Shoys Wines Criminal

Investigation.

The Trustee had taken no action to separate himself from Christie's and, by doing so,

placed his relationship with Christie's before his duty to the Estate and the Court. The failure of

the Trustee's supervisory duty to discharge Christie's and to criminally refer Christie's, or at least

notify the Court of their improper conduct, made it clear that Christie's conflict was a conflict of

all the Defendants.

Objectively examining the False Accounting as a stand-alone basis, the Defendants have

no quasi-immunity because of their intentional breaches of fiduciary and statutory Duties.

Moreover, the intentional torts, and the events supporting the Trustee's Contempt Motions, the

False Accounting, were *ultra vires* actions because they were acting as Greenlight's collection

agents. The events were permeated with criminality.[15]

## CONCLUSION

Plaintiffs Complaint properly and clearly alleges that the entirety of the Shoys Wines

Fraud, including the Contempt Hearing, was under color of law. The Complaint sets out these facts

clearly and, at this point in the proceeding, must be accepted as true. It is without dispute that the

---

[15] The Complaint includes numerous references to criminal statutes violated by the Defendants' conduct.

Contempt Hearing was a narrowly confined proceeding prosecuted by conflicted Estate Counsel who, because of that conflict, should never have been then representing the Estate. If nothing else, the Estate's attorneys were witnesses to the Shoys Estate events and, as this Court is well aware, a lawyer can never be a witness *and* an attorney in the same proceeding. Further, the adjudicated facts from PL Benta's Administrative Hearing, standing alone, establish that the proceeding was under the color of law and likely, never have taken place. The Chapter 7 professionals assisted, if not caused, the obstruction of the VIPD Shoys Wines criminal investigation.

Plaintiffs' Complaint was properly filed and served upon Defendants. It properly alleges facts that, if found by a jury (or other fact-finder) to be true by a preponderance of the evidence, would result in significant damages to Plaintiffs. It gives adequate notice to the Defendants of the claims, and none are time-barred or otherwise adjudicated by a court of competent jurisdiction.

Defendants' motion to dismiss the Complaint must fail and the motion denied in its entirety.

Respectfully submitted,

**LAW OFFICES OF NORMAN A. ABOOD**

By: /s/Norman A. Abood
    Norman A. Abood, Esq.
    Law Offices of Norman A. Abood
    101 Broadcast Building
    136 North Huron Street
    Toledo, Ohio 43604

    *Attorney for Jeffrey J. Prosser*

And

**LAW OFFICES OF
LAWRENCE H. SCHOENBACH**

By: /s/Lawrence H. Schoenbach
    Lawrence H. Schoenbach, Esq.
    Law Offices of Lawrence H. Schoenbach

111 Broadway, Suite 901
New York, New York 10006

*Attorney for Jeffrey J. Prosser*

And

**DAWN E. PROSSER**

By: _____
      Dawn E. Prosser, *Pro Se*
      P.O. Box 3426
      Palm beach, FL 33480

And

**OAKLAND BENTA**

By:  Approved by Phone
      Oakland Benta, *Pro Se*
      P.O. Box 3388
      Frederikstead
      St. Croix, USVI 00841

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on **February 17, 2022**, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing to all attorneys of record.

By:  /s/Norman A. Abood
      Norman A. Abood, Esq.
      *Attorney for Jeffrey J. Prosser*